## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SHEILA GRIFFIN, as Independent Administrator of the Estate of R.R., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 20-cv-1427-JES-JEH |
| MARY ANN POYNTER, et al., | ) ) ) | |
| Defendants. | ) | |

## <u>ORDER AND OPINION</u>

This matter is now before the Court on Defendants' Motion (Doc. 26) to Dismiss, Memorandum in Support (Doc. 27), and Plaintiff's Response (Doc. 29). For the reasons set forth below, Defendants' Motion (Doc. 26) is denied.

### BACKGROUND

The following facts are taken from Plaintiff's Amended Complaint (Doc. 3), which the Court accepts as true for the purposes of a motion to dismiss. *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015). Plaintiff, the appointed administrator of the estate of R.R.,[1] brought this action against multiple employees at the Illinois Department of Children and Family Services (DCFS). Defendant Richard Roundtree was the father of R.R. Defendant Cynthia Clay was Richard Roundtree's girlfriend. Together, they resided with R.R. in McLean County, Illinois. An Entry of Default was entered against Defendants Roundtree and Clay on

---

[1] Pursuant to Fed. R. Civ. P. 5.2(a) and CDIL L.R. 5.11, the Court refers to the deceased minor by her initials, R.R. For the sake of clarity, the Court disregards the distinction between the deceased minor and her estate, and references both Griffin and R.R. as Plaintiff throughout this Opinion.

March 10, 2021; they are currently in custody and they have not participated in this litigation.[2]
*See* March 10, 2021 Text Order.

## Summary of the Amended Complaint

On January 26, 2019, at the age of 9 years, R.R. was pronounced dead. She was abused and tortured for years prior by both Roundtree and Clay before Clay took R.R.'s life. This litigation was commenced by R.R.'s estate against individuals employed by DCFS who were involved with investigating reports of abuse in the months and years prior to R.R.'s death.

Plaintiff brings multiple claims. In Count 1, she alleges the DCFS Defendants violated her substantive due process rights under the 14th Amendment by falsifying reports of abuse, concluding those reports were unfounded, and conducting sham investigations which emboldened and encouraged Roundtree and Clay to continue abusing R.R. She further alleges the DCFS Defendants committed tortious acts or treated R.R. differently from similarly situated non-African American individuals because of her race. These are the claims which are the subject of the instant Motion to Dismiss. *See* Doc. 26. The remaining claims in the Amended Complaint include: In Counts 2 and 3, she alleges battery against Rountree as a survival action (Count 2) and as a wrongful death claim (Count 3); Count 4 alleges assault against Roundtree; Counts 5 and 6 sound in battery and wrongful death against Clay; and Count 7 alleges assault against Clay.

## R.R.'s Placement with Richard Roundtree

In September 2016, DCFS placed R.R. in the temporary custody of her father, Richard Roundtree, who resided with Cynthia Clay. Clay had a history of child abuse before this time, including a report from 2002 indicating Clay had inflicted cuts, welts, and bruises to a stepchild;

---

[2] Also for the sake of clarity, the Court's references to "Defendants" includes only the DCFS Defendants unless otherwise noted.

reports in 2007 and 2012 alleging Clay inflicted cuts, welts, and bruises on a stepchild, a 2014 report alleging Clay neglected three of her biological children and two stepchildren so as to pose a risk of harm to the children, and a 2016 report alleging Clay provided inadequate supervision to two of her stepchildren.

Roundtree also had multiple interactions with DCFS prior to September 2016. In 2013, he was reported to have tortured and provided inadequate supervision to a stepchild; in 2014 he was reported to have subjected a stepchild to a risk of harm; in 2015 he was reported to have subjected three stepchildren to a risk of harm by neglect; also in 2015, he was reported to have subjected a stepchild to a risk of harm by neglect.

**The September 2016 DCFS Investigation**

On September 29, 2016, DCFS was contacted regarding an allegation of neglect of R.R. and her brother arising out of an event resulting in the arrest of R.R.'s mother, Antionetta Roundtree. Defendant Mary Ann Poynter, a Child Protection Specialist at DCFS, was assigned to investigate the allegation of neglect, seek appropriate placement for R.R., and ensure that Richard Roundtree was an appropriate custodial parent before placing R.R. in his custody. Plaintiff alleges Poynter conducted a sham investigation, omitted information from her report, and/or inserted false information in her report of her investigation. Plaintiff further alleges Poynter knew or suspected R.R. was at risk for abuse while in the custody of Roundtree and Clay and consciously ignored and failed to stop the abuse. Poynter conferred with her supervisor, Defendant Ashley Deckert, who was a Public Service Administrator employed by DCFS. As a Public Service Administrator, Defendant Deckert's responsibilities included supervising and reviewing Defendant Poynter's work to ensure she had performed the investigation in conformance with DCFS procedures, and to confirm the findings before R.R. was placed in the

3

custody of Richard Rountree. Plaintiff alleges Defendant Deckert knew or should have known Defendant Poynter had conducted a sham investigation and/or falsified or omitted information from her report, knew or suspected R.R. was at risk for abuse if placed in the custody of Richard Roundtree and Cynthia Clay, and deliberately and with reckless indifference, approved, authorized, directed, and/or otherwise condoned Poynter's investigation.

**The July 2017 DCFS Investigation**

On July 24, 2017, R.R.'s mother contacted DCFS's child abuse hotline and reported that R.R. was being regularly whipped with a belt by Cynthia Clay. Defendant Johanna O'Brien, a Child Protection Specialist employed by DCFS, was assigned to investigate the report. Plaintiff makes allegations against Defendant O'Brien similar to those against Defendant Poynter: she conducted a sham investigation, omitted information from her report, and/or inserted false information in her report of her investigation. Plaintiff further alleges Poynter knew or suspected R.R. was at risk for abuse while in the custody of Roundtree and Clay and consciously ignored and failed to stop the abuse. On July 25, 2017, Defendant O'Brien categorized the hotline call as unfounded, a characterization Plaintiff contends was false. O'Brien met and conferred with her supervisor, Defendant Mark Delashmit, a DCFS Child Protection Supervisor, regarding her findings before issuing a final investigative report and closing her investigation into the July 2017 hotline call.

Similar to Defendant Supervisor Deckert, Plaintiff alleges Delashmit's responsibilities included supervising and reviewing Defendant O'Brien's work to ensure she had performed the investigation in conformance with DCFS procedures, and to confirm the findings before a final report and conclusion could be issued. Plaintiff alleges Delashmit conducted his own investigation into the July 2017 hotline call and learned information that caused him to suspect

or know R.R. was at risk for abuse while in the custody of her father. As part of his investigation, Plaintiff alleges Delashmit knew or should have known O'Brien had conducted a sham investigation, and had included false information and/or omitted information from her report, and yet with deliberate and reckless indifference and in disregard for his duties, he approved, authorized, directed, or otherwise condoned the sham investigation and issuance of a final report concluding the hotline call was unfounded. Plaintiff further alleges DCFS informed Rountree and Clay of the investigation and the conclusion that the report was unfounded.

**The April 2018 DCFS Investigation**

On April 20, 2018, R.R.'s mother contacted the DCFS hotline to report observing R.R. with multiple facial injuries, including a wound on the lip, bruises and swelling to one eye, a gash over the other eye, and numerous scars over the neck. R.R.'s mother also reported that R.R. was afraid of going home, and her belief that R.R. was being abused by Roundtree's girlfriend. Defendant Stafanie Moreau, a DCFS Child Protection Specialist, was assigned to investigate the April 2018 hotline call. When Moreau arrived at R.R.'s school, she observed a scab over R.R.'s eyebrow, a sore on her lip, and a broken tooth. Moreau interviewed Roundtree and Clay, who provided conflicting stories regarding when and how R.R. sustained the injuries. Similar to the allegations against Poynter and O'Brien, Plaintiff alleges Moreau conducted a sham investigation, omitted information from her report, and/or inserted false information in her report of her investigation. Plaintiff further alleges Moreau knew or suspected R.R. was at risk for abuse while in the custody of Roundtree and Clay and consciously ignored and failed to stop the abuse. On April 26, 2018, Plaintiff alleges Moreau falsely categorized the April 2018 hotline allegations as unfounded. Pursuant to DCFS procedures, Defendant Moreau met and conferred with her supervisor, Defendant and DCFS Child Protection Supervisor Mark Ohrwall.

5

Similar to Defendant Supervisors Delashmit and Deckert, Plaintiff alleges Defendant Ohrwall's responsibilities included supervising and reviewing Defendant Moreau's work to ensure she had performed the investigation in conformance with DCFS procedures, and to confirm the findings before a final report and conclusion could be issued. On June 19, 2018, Defendant Ohrwall knew or should have known Defendant Moreau had conducted a sham investigation, and had included false information and/or omitted information from her report, and yet with deliberate and reckless indifference and in disregard for his duties, he approved, authorized, directed, or otherwise condoned the sham investigation and issuance of a final report concluding the hotline call was unfounded. Plaintiff further alleges DCFS informed Rountree and Clay of the investigation and the conclusion that the report was unfounded.

**The December 2018 DCFS Investigation**

On December 10, 2018, the nurse at R.R.'s school contacted the DCFS hotline to report that R.R. came to school with visible cuts, bruises, welts, oral abrasions, and two black eyes at various stages of healing after missing two days of school the week prior. Defendant Patricia Shannon, a DCFS Child Protection Specialist, was assigned to investigate the December 2018 hotline call. The school nurse told Defendant Shannon that R.R. had other marks on her face not consistent with an accidental trip, but rather evidence of child abuse. Shannon directed Roundtree to take R.R. to the hospital so that an emergency doctor could opine on the cause of the black eyes. Shannon later learned the doctor was unable to determine the cause of R.R.'s injuries. Similar to the allegations against Poynter, O'Brien, and Moreau, Plaintiff alleges Shannon conducted a sham investigation, omitted information from her report, and/or inserted false information in her report of her investigation. Plaintiff further alleges Shannon knew or suspected R.R. was at risk for abuse while in the custody of Roundtree and Clay and consciously

6

ignored and failed to stop the abuse. Further, Plaintiff alleges Shannon falsely categorized the December 2018 hotline allegations as unfounded. Pursuant to DCFS procedures, Defendant Shannon met and conferred with her supervisor, Defendant and DCFS Child Protection Supervisor Daniel Norris.

Similar to Defendant Supervisors Delashmit, Deckert, and Ohrwall, Plaintiff alleges Defendant Norris's responsibilities included supervising and reviewing Defendant Shannon's work to ensure she had performed the investigation in conformance with DCFS procedures, and to confirm the findings before a final report and conclusion could be issued. Plaintiff alleges Defendant Norris knew or should have known Defendant Shannon had conducted a sham investigation, omitted information from her report, and/or inserted false information in her report of her investigation, and with deliberate and reckless indifference and in disregard for his duties, approved, authorized, directed, and/or otherwise condoned Defendant Shannon's conduct, investigation, and issuance of a final report concluding the allegations of abuse were unfounded. Once again, Roundtree and Clay were notified of the investigation and the conclusion that the report was unfounded.

**R.R.'s January 2019 Death**

On January 26, 2019, R.R. was brought to OSF Saint Francis Medical Center. She was unresponsive, presenting with a tense belly and a large bruise on her stomach area. Surgical intervention was unsuccessful, and R.R. was pronounced dead in the early morning hours of January 26, 2019. An autopsy was conducted wherein the coroner identified approximately 30 scars on R.R.'s back and torso, scars and abrasions to her face and neck, scarring on her upper left thigh consistent with cigarette burns, and other bruising all over her body. The coroner concluded R.R.'s cause of death was peritonitis due to a perforated ileum caused by blunt force

trauma to the abdomen. Roundtree was subsequently charged and pleaded guilty to endangering the life of R.R. Clay was convicted by a jury for R.R.'s murder. Both are presently in the custody of the Illinois Department of Corrections. R.R. is survived by her mother, Antionetta Roundtree, and 4 siblings.

**Allegations Related to DCFS**

Although DCFS is not named as a defendant in this action, Plaintiff's Amended Complaint makes several allegations regarding DCFS. *See* Doc. 3 at 12–14. Specifically, Plaintiff alleges DCFS has maintained a system that violates the 14th Amendment rights of children, including the rights to life, liberty, pursuit of happiness and equal protection under the laws, and particularly those rights of African American children like R.R., by the following practices, policies, and customs:

> (a) the failure to properly hire, train, supervise, discipline, transfer, monitor, counsel and/or otherwise control DCFS investigators and supervisors who omit and/or ignore evidence, falsify evidence, conduct sham investigations, and otherwise create false investigative reports, wrongly categorizing reports of child abuse as "Unfounded" despite knowledge and/or suspicion of abuse, and who treat African American children differently than similarly situated non- African American children;
>
> (b) encouragement, incentives, and/or requirements that investigators and supervisors set aside suspicion and/or knowledge of abuse, perform sham investigations, include false information and/or omit information from investigative reports, so to close cases quickly;
>
> (c) the failure to properly investigate reports of abuse, to include false information and/or omit information from investigative reports, and in particular concerning African American children;
>
> (d) a code of silence among DCFS Child Protection Specialists and Child Protection Supervisors, amongst others, regarding sham investigations, falsified reports, and/or disparate treatment of African American children within DCFS;
>
> (e) the failure to properly discipline, monitor, counsel and otherwise control DCFS investigators and supervisors who engage in sham investigations, omit and/or falsify evidence in investigatory reports, and treat African American children differently than similarly situated non- African American children who are subjects of child abuse reports.

Doc. 3 at 12.

Further, Plaintiff's Amended Complaint goes on to detail DCFS's troubled history, including summaries of findings by Illinois' Office of Inspector General (OIG). Included in those allegations are statistics from the OIG indicating that from July 1, 2018 to June 30, 2019, 123 children who had contact with DCFS died within 12 months. Of those 123 children, 47 of them (or 38%) had cases in which DCFS deemed the report of abuse as unfounded. Similarly, in a 2019 report from OIG, it found 37 of the 98 children (37.8%) died within 12 months of contact with DCFS in cases in which the report of abuse against the family member was deemed unfounded. In the 2018 report, 33 of 108 child deaths (30.6%) occurred in cases where the report of abuse against the family member had been deemed unfounded. Plaintiff goes on to detail findings from the 2018 report which concluded systemic deficiencies within the DCFS system contributed to fatal outcomes, largely due to dangerously high case loads creating incentives for investigators to close cases. Lastly, Plaintiff references OIG's 2019 report which acknowledged that African American and Latino children experienced poorer outcomes than their White counterparts in the Illinois child welfare system, and that such disparities were the result of implicit racial bias and structural racism.

**Substantive Due Process and Equal Protection**

In Count 1 of her Amended Complaint, Plaintiff alleges the DCFS child protection specialist and supervisor Defendants violated 42 U.S.C. § 1983 by way of the alleged conduct described above. Doc. 3 at 14–16. Plaintiff alleges each DCFS Defendant emboldened and encouraged R.R.'s abusers to punish, torture, and abuse R.R. to the point of death, ultimately depriving R.R. of her constitutional right to life, liberty, property, and equal protection under the law. Plaintiff alleges the DCFS investigators' actions were intentional and done with knowledge that R.R. was at risk of abuse from Roundtree and Clay. Plaintiff further alleges the DCFS

investigators treated R.R. differently than similarly situated non-African American children because R.R. was African American.

Plaintiff alleges the DCFS supervisor Defendants knew of a pattern of misconduct by DCFS child protection specialists and suspected or knew of a substantial risk that those DCFS workers would violate the rights of R.R. and other children by deliberately, consciously, and/or with reckless indifference, chose a course of action that allowed the abuses to continue, thereby authorizing, approving, directing or otherwise condoning such violations. Plaintiff likewise alleges the DCFS supervisor Defendants treated R.R. differently than similarly situated non-African American children because R.R. was African American. Lastly, Plaintiff alleges Defendants were the proximate and legal cause of her injuries, Defendants conspired together to violate her constitutional rights, and that she and her next-of-kin suffered damages as a result.

### LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) challenges whether a complaint sufficiently states a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). The Court accepts well-pleaded allegations in a complaint as true and draws all permissible inferences in favor of the plaintiff. *See Bible*, 799 F.3d at 639. To survive a motion to dismiss, the complaint must describe the claim in sufficient detail to put defendants on notice as to the nature of the claim and its bases, and it must plausibly suggest that the plaintiff has a right to relief. *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007). A complaint need not allege specific facts, but it may not rest entirely on conclusory statements or empty recitations of the elements of the cause of action. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

However, "[a] claim must be plausible, but it need not supply the specifics required at the summary-judgment stage." *Graham v. Bd. of Educ.*, 8 F.4th 625, 627 (7th Cir. 2021).

**DISCUSSION**

In their Memorandum in Support of their Motion to Dismiss, Defendants argue Plaintiff has failed to state a claim under 42 U.S.C. § 1983 for a violation of her due process rights because: (1) under *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), Plaintiff has failed to allege either a custodial relationship between the State and R.R., and (2) the state-created danger exception to *DeShaney* does not apply because (i) Plaintiff does not allege Defendants created or increased a danger to R.R., (ii) Defendants' investigations were not the proximate cause of R.R.'s injuries, and (iii) Defendants' conduct does not shock the conscience. Doc. 27 at 4-12. Further, Defendants argue Plaintiff fails to allege an equal protection claim based on race because she has failed to adequately allege personal involvement of the named Defendants. *Id*. at 13-14. Penultimately, Defendants argue they are entitled to qualified immunity. *Id*. at 14-15. Finally, Defendants claim the doctrine of *respondeat superior* bars the claims against the supervisory DCFS Defendants. *Id*. at 15. Plaintiff has responded to the arguments raised in Defendants' Motion. *See* Doc. 29. This Order follows.

**(1) *DeShaney***

Defendants' principal argument relies on the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). Doc. 27 at 4. Indeed, the allegations in Plaintiff's Amended Complaint are remarkably—and regrettably—similar to the factual background in *DeShaney*. Chief Justice Rehnquist succinctly summarized the underlying facts of *DeShaney* as follows:

> Petitioner is a boy who was beaten and permanently injured by his father, with whom he lived. Respondents are social workers and other local officials who

11

received complaints that petitioner was being abused by his father and had reason
to believe that this was the case, but nonetheless did not act to remove petitioner
from his father's custody.

*DeShaney*, 489 U.S. at 191. At issue in *DeShaney* was "when, if ever, the failure of a state or

local governmental entity or its agents to provide an individual with adequate protective services

constitutes a violation of the individual's due process rights[.]" *Id*. at 194. In answering that

question, the Supreme Court first noted the "Due Process Clauses generally confer no affirmative

right to governmental aid, even where such aid may be necessary to secure life, liberty, or

property interests of which the government itself may not deprive the individual." *Id*. at 196

(citations omitted). However, "in certain limited circumstances the Constitution imposes upon

the State affirmative duties of care and protection with respect to particular individuals." *Id*. at

198. First, "when the State takes a person into its custody and holds him there against his will,

the Constitution imposes upon it a corresponding duty to assume some responsibility for his

safety and general well-being." *Id*. at 199–200 (citing *Youngberg v. Romeo*, 457 U.S. 307, 317

(1982)). This "affirmative duty to protect arises not from the State's knowledge of the

individual's predicament or from its expressions of intent to help him, but from the limitation

which it has imposed on his freedom to act on his own behalf." *Id*. at 200. Thus, "[i]n the

substantive due process analysis, it is the State's affirmative act of restraining the individual's

freedom to act on his own behalf—through incarceration, institutionalization, or other similar

restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the

Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by

other means." *Id*.

   Applying the above principles to the facts of *DeShaney*, the Supreme Court concluded:

   The *Estelle–Youngberg* analysis simply has no applicability in the present case.
   Petitioners concede that the harms Joshua suffered occurred not while he was in the

12

State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

It may well be that, by voluntarily undertaking to protect Joshua against a danger it concededly played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger. But the claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation. A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes. But not "all common-law duties owed by government actors were ... constitutionalized by the Fourteenth Amendment." Because, as explained above, the State had no constitutional duty to protect Joshua against his father's violence, its failure to do so—though calamitous in hindsight—simply does not constitute a violation of the Due Process Clause.

*DeShaney*, 489 U.S. at 201–02 (citations omitted). Thus, there are two exceptions to *DeShaney*'s general rule: "(1) when the state has a 'special relationship' with the person such as 'when it has custody over a person, it must protect him because no alternate avenues of aid exist,' and (2) under the state-created danger exception, "liability exists when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015) (citations omitted). Here, Plaintiff argues her claims may proceed under the state-created danger exception to *DeShaney*, so the Court will direct its focus to that exception. *See* Doc. 29 at 3.

(a) *State-Created Danger*

The state-created danger exception to *DeShaney* is narrow, and applies where the state creates or increases a danger to an individual. *Doe*, 782 F.3d at 917 (citing *Hernandez v. City of Goshen, Ind.*, 324 F.3d 535, 538 (7th Cir. 2003); *Sandage v. Bd. of Comm'rs*, 548 F.3d 595, 598–

99 (7th Cir. 2008); *Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012)). "When courts speak of the state's 'increasing' the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Id*. (quoting *Sandage*, 548 F.3d at 600). The Seventh Circuit in *Doe* then discussed prior cases where the state-created danger exception was at issue.

> The "cases in which we have either found or suggested that liability attaches under the 'state-created danger' exception are rare and often egregious." *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1022 (7th Cir. 2003). In *White v. Rochford*, 592 F.2d 381, 382 (7th Cir. 1979), for example, the police arrested a driver for drag racing and left the children passengers stranded alone in the car on a busy highway on a cold night. In *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993), we concluded that police officers could be held liable under the state-created danger exception where they arrested a sober driver and left behind an obviously drunk passenger with the keys to the vehicle who later caused a collision, injuring the plaintiffs. In *Monfils,* a police officer took responsibility for preventing release of a tape recording of an informant's anonymous tip but then went deer hunting instead of taking standard steps to prevent the tape's release despite knowing that the release would place the informant in heightened danger, and the informant was killed. *Monfils*, 165 F.3d at 520. And recently in *Paine*, the police arrested a woman in a safe place and released her in a hazardous one while she was unable to protect herself. 678 F.3d at 511. In each of these cases, the police encountered a potential danger and turned it into an actual one. And in each of these cases, the plaintiff was safe, or at least considerably safer, before the police acted than he or she was thereafter.
>
> In contrast, for example, in *Windle v. City of Marion*, 321 F.3d 658, 661–62 (7th Cir. 2003), we held that a police officer's failure to intervene to protect a student despite knowledge that she was being sexually molested by a middle school teacher did not increase the danger. For at least two months, police officers intercepted telephone conversations between the student and teacher and learned that the student was being molested by the teacher. *Id.* at 660. The officers had enough information to conduct an investigation and intervene on the student's behalf, but they did nothing. *Id.* We held that the officers' inaction did not create a danger, nor did they do anything to make the danger to the student worse. *Id.* at 662. We reasoned that "we ha[d] no way of knowing what would have occurred" had the police actually done something, and that "the police might have failed at protecting [the plaintiff]." *Id.* Had the police never been involved, the danger to the plaintiff would have been the same or worse. *Id.* We noted that the plaintiff waived the argument that, and we did not address whether, "a constitutional violation would exist where one member of a law enforcement unit discouraged or prevented another from protecting a victim."

14

*Doe*, 782 F.3d at 917–18.

In *Doe*, the plaintiff was a minor female who was drinking vodka with three males. When the apartment manager called police to report them, an officer responded to the scene where he saw a very intoxicated Doe being held up by the males. The officer told the males to take Doe home and let them leave the scene. He falsely reported to dispatch that the subjects were not present when he arrived, and called off another officer. Doe was later sexually assaulted by one of the males. *Id.* at 912. In finding the state-created danger did not apply to Doe's case, the court reasoned:

> This case is not sufficiently similar to those cases in which we have applied the state-created danger exception; it is more like *Windle* and cases in which the exception was inapplicable. Del Boccio did not create the danger to Doe, nor did he do anything to make the danger to her worse. When he left Doe with the three young males, he left her just as he found her, "plac[ing] [her] in no worse position than that in which [s]he would have been had [he] not acted at all." *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998. Not even the allegations that Del Boccio called off Officer Spoerry (or falsely reported to dispatch that the subjects were gone) created or increased the danger to Doe. Had Del Boccio had not called off Officer Spoerry or falsely reported to dispatch, we have no way of knowing what would have happened. Officer Spoerry might have failed at protecting Doe. *See Windle*, 321 F.3d at 662.

> This contrasts with *Ross v. United States*, 910 F.2d 1422, 1424–25 (7th Cir. 1990), where competent rescuers were on the scene with rescue equipment and ready to begin their efforts to rescue a drowning boy when the police arrived and ordered them to cease their efforts because county policy prohibited civilian rescue attempts. A sheriff's deputy advised the rescuers that he would arrest them upon their entry into the water and even placed his boat so as to prevent their dive. *Id.* at 1425. About thirty minutes after the boy had fallen into the water, the authorized divers arrived and pulled him out of the water. *Id.* He died the next day. *Id.* We held that plaintiff sufficiently alleged a constitutional injury. *Id.* at 1433–34. Significantly, in *Ross* the chances of a successful rescue were high, and there was a direct connection between the deputy's actions and the boy's drowning. Here, we can only speculate whether Del Boccio made Doe worse off, whether by calling off Officer Spoerry or falsely reporting to dispatch.

> This is not a case in which Doe was safe, or even considerably safer, before Del Boccio acted. His alleged conduct did not turn a potential danger into an actual one;

> Doe was in actual danger already. Therefore, Del Boccio had no constitutional duty to protect her. But even if calling off Officer Spoerry violated Doe's constitutional rights, it was not clearly established and Del Boccio nonetheless would be entitled to qualified immunity.

*Doe*, 782 F.3d at 918.

Against this backdrop, Defendants argue Plaintiff fails to state a claim under either exception to *DeShaney*. First, it argues the State did not have a custodial relationship with R.R. Doc. 27 at 7. Second, it argues the state-created danger exception does not apply because (i) Plaintiff does not allege Defendants created or increased a danger to R.R., (ii) Defendants' investigations were not the proximate cause of R.R.'s injuries, and (iii) Defendants' conduct does not shock the conscience. Doc. 27 at 4-12. In her Response, Plaintiff argues the Defendants *did* play a part in the creation of the danger of abuse she faced and Defendants *did* render her more vulnerable to that danger, and thus the state-created danger exception applies. Doc. 29 at 3.

In order to survive Defendants' Motion to Dismiss, Plaintiff must allege three elements: "(1) the government, by its affirmative acts, created or increased a danger to the plaintiff; (2) the government's failure to protect against the danger caused the plaintiff's injury; and (3) the conduct in question "shocks the conscience." *Est. of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 1121 (2020) (citing *Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015); *King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 819 (7th Cir. 2007); *Slade v. Bd. of Sch. Dirs. of Milwaukee*, 702 F.3d 1027, 1033 (7th Cir. 2012). Here, Defendants discuss case law in the circuit and argue this case is distinguishable from cases where the court found the defendant changed a safe situation into a dangerous one, reasoning that in each of the other cases, the plaintiff was safer before intervention by the police or state actor. Doc. 27 at 10. In her Response, Plaintiff argues this case is not one where Defendants failed to act but rather one

where Defendants took active steps to falsify reports, falsely categorize allegations as unfounded, and encouraged or emboldened Roundtree and Clay to continue the abuse. Doc. 29 at 6.

Although the allegations in Plaintiff's Amended Complaint might lack sufficient evidentiary support when considering the record at summary judgment, the Court must accept the allegations in Plaintiff's Amended Complaint as true for the purposes of deciding a motion to dismiss. *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015). Under that standard, Plaintiff has sufficiently alleged a procedural due process claim under the state-created danger exception to *DeShaney*. First, Plaintiff has sufficiently alleged the DCFS Defendants' acts created or increased the risk of danger to R.R. These alleged acts included falsifying reports of abuse, concluding those reports were unfounded, and conducting sham investigations which emboldened and encouraged Roundtree and Clay to continue abusing R.R. *See, e.g.*, Doc. 3 at 4–6; *Est. of Her*, 939 F.3d at 876.

Second, Plaintiff has sufficiently alleged DCFS's conduct increased risk of abuse and caused R.R.'s death because Defendants emboldened and encouraged Roundtree and Clay to continue the abuse by concluding the reports of abuse were unfounded and informing Clay and Roundtree of those conclusions. Further, she alleges Roundtree and Clay's access to children and propensity toward child abuse were specific dangers known to Defendants. *Est. of Her*, 939 F.3d at 876. Finally, accepting Plaintiff's allegations as true, Plaintiff has sufficiently alleged conduct which "shocks the conscience." *Id.* at 876. Specifically, Plaintiff does not merely allege Defendants acted negligently or carelessly, but rather alleges specific, deliberate conduct by each Defendant indicating each Defendant knew of and deliberately chose a course of conduct knowing it would result in harm or an increased risk of harm to R.R. *See* Doc. 29 at 8. In other words, Plaintiff alleges the DCFS Defendants acted "with a *mens rea* akin to criminal

recklessness[.]" *Est. of Her*, 939 F.3d at 877. Whether Plaintiff can support these allegations with sufficient evidence to survive summary judgment is a question left for another day. Defendant's Motion to Dismiss Plaintiff's Amended Complaint is denied as is relates to Plaintiff's substantive due process claim.

**(2) Equal Protection**

Next, Defendants argue Plaintiff fails to state an equal protection claim based on race. Doc. 27 at 13–15. In support of this argument, Defendant first posits that "the equal protection clause should not be used as a means to avoid the *DeShaney* principle that there is no state protection for acts carried out by a private actor." Doc. 27 at 13 (citing *Bond v. Atkinson*, 728 F.3d 690, 691 (7th Cir. 2013)). But Defendants' citation to *Bond* is puzzling—it says nothing about prohibiting the use of equal protection claims when substantive due process claims would be unavailing. Rather, the Court in *Bond* simply stated that "*DeShaney* observes that equal-protection claims may succeed even when due-process theories fail" and thus "[a] state is not obliged to protect residents from crime (that's the holding of *Castle Rock* and *DeShaney*), but when the state chooses to provide protective services it cannot protect men while failing to protect women." *Bond*, 728 F.3d at 691 (citations omitted). Here, Plaintiff has alleged Defendants' actions were caused, at least in part, because of R.R.'s race. Doc. 3 at 15.

Defendants also note that large portions of Plaintiff's Amended Complaint focus on the DCFS system in Illinois generally, and argue Plaintiff "failed to allege the personal involvement of each Defendant." Doc. 27 at 13. Defendants go on to argue Plaintiff has not plausibly alleged intentional discrimination by Defendants because she "does not allege any conduct which indicates that each individual Defendant's actions violated Plaintiff's equal protections rights or that their actions were motivated by race." *Id*. at 14. Plaintiff responds by referencing her

allegations of discriminatory motive and intent for each of the individual Defendants. In addition, Plaintiff points to the policies, practices, and customs of DCFS including findings by OIG of disparate treatment and DCFS's public acknowledgement that minority children experienced poorer outcomes than their White counterparts. Doc. 29 at 9.

The Court believes Plaintiff has sufficiently alleged an equal protection claim in her Amended Complaint. Again, Plaintiff alleges specific, deliberate conduct by each Defendant indicating each Defendant knew of and deliberately chose a course of conduct knowing it would result in harm or an increased risk of harm to R.R. She then alleges Defendants did so, at least in part, because of R.R.'s race. The allegations related to DCFS generally provide context to those allegations and suggest Plaintiff will pursue a theory that the DCFS Defendants, faced with an impossibly high case load, chose to protect non-minority children over or before protecting minority children such as R.R. Thus, while Illinois might not have a duty to protect children from abuse, when it chooses to provide protective services to children it cannot discriminate based on race, sex, or religion when deciding whether a child is deserving of its protection. *See Bond*, 728 F.3d at 691 ("A state is not obliged to protect residents from crime, but when the state chooses to provide protective services it cannot protect men while failing to protect women. The state must provide *equal* protection of the laws, without discriminating on account of race, sex, religion, or other criteria the Constitution places off limits.") (cleaned up). Accordingly, the Court finds Plaintiff has sufficiently alleged an equal protection claim and denies this portion of Defendants' Motion to Dismiss.

**(3) Qualified Immunity**

Next, Defendants argue they are entitled to qualified immunity because they did not violate Plaintiff's clearly established constitutional rights. Doc. 27 at 14. "Qualified immunity

shields a government official from liability for damages when the official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Doe*, 782 F.3d at 915. Plaintiff has not identified any case factually similar to this one that would have provided a reasonable DCFS employee with notice that he or she had a constitutional duty to protect R.R. under the facts alleged in the Amended Complaint. *See* Doc. 29 at 10–12. However, Plaintiff argues no reasonable person in Defendants' shoes, as DCFS child protection specialists and supervisors, would think the law allowed them to falsify reports, omit information, condone deliberate misconduct, label the allegations of abuse against R.R. as unfounded despite their knowledge or suspicion of actual abuse, and to do these acts because R.R. was African American. Doc. 29 at 11.

Accepting Plaintiff's allegations as true and viewing them in the light most favorable to her, she has alleged Defendants intentionally created or increased the danger of abuse to R.R. by falsifying reports, condoning other DCFS workers' misconduct, and falsely labeling the allegations of abuse against R.R. as unfounded despite their knowledge to the contrary, and by telling R.R.'s custodians of their findings, rendering R.R. more vulnerable to abuse. Assuming Plaintiff is able to substantiate her claims over the course of discovery, the right to be free from state-created dangers is sufficiently clear to put Defendants on notice that the Constitution prohibited such conduct. *See Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993) ("[P]laintiffs such as the Reeds may state claims for civil rights violations if they allege state action that creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger that they otherwise would have been."). Likewise, the right to equal protection under the law is embodied in the 14th Amendment, and, as concluded above, while Illinois might not have a duty to protect children from abuse, when it chooses to provide

protective services to children it cannot discriminate based on race, sex, or religion when deciding whether a child is deserving of its protection. *See Bond*, 728 F.3d at 691. Thus, when accepting Plaintiff's allegations as true and viewing them in the light most favorable to her, the Court cannot say at this juncture that Defendants are entitled to qualified immunity. Determination of this issue necessarily depends on development of a factual record and is thus ill-suited for resolution under Rule 12(b)(6). *See Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) ("The crucial question is whether the official acted reasonably in the *particular circumstances* that he or she faced.") (cleaned up, with emphasis original); *see also id.* at 548 ("Because a qualified immunity defense so closely depends 'on the facts of the case,' a 'complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds.' ") (citations omitted). Accordingly, the Court denies Defendants' Motion to Dismiss as it relates to qualified immunity.

**(4) *Respondeat Superior***

Finally, Defendants move for dismissal of claims against Defendants Ohrwall and Norris. Doc. 27 at 15. Defendants correctly state that liability under 42 U.S.C. § 1983 only extends to a defendant's personal acts or decisions. *Id.* (citing *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011)). The premise of Defendants' argument is that Plaintiff fails to adequately allege the personal involvement of supervisory Defendants Ohrwall and Norris. In her Response, Plaintiff explains she does not seek recovery against Defendants Ohrwall and Norris based on a *respondeat superior* theory of liability, but rather based on a theory of supervisor liability. Doc. 29 at 12 (citing *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 471 (7th Cir. 1997)).

"In order to be held liable under a theory of supervisor liability, the supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of

what they might see." *Jones v. City of Chi.*, 856 F.2d 985, 992–93 (7th Cir. 1988). Recall that Plaintiff alleges Defendant Ohrwall knew or should have known Defendant Moreau had conducted a sham investigation, and had included false information and/or omitted information from her report, and yet with deliberate and reckless indifference and in disregard for his duties, he approved, authorized, directed, or otherwise condoned the sham investigation and issuance of a final report concluding the hotline call was unfounded. Similarly, Plaintiff alleges Defendant Norris knew or should have known Defendant Shannon had conducted a sham investigation, omitted information from her report, and/or inserted false information in her report of her investigation, and with deliberate and reckless indifference and in disregard for his duties, approved, authorized, directed, and/or otherwise condoned Defendant Shannon's conduct, investigation, and issuance of a final report concluding the allegations of abuse were unfounded. Although these allegations are not very illuminating, they do allege the personal involvement of supervisor Defendants Ohrwall and Norris. Accordingly, Defendants' Motion to Dismiss is denied as to this issue as well.

## CONCLUSION

For the reasons set forth above, Defendants' Motion (Doc. 26) to Dismiss is denied.

Signed on this 30th day of September, 2021.

<u>s/ James. E. Shadid</u>
James E. Shadid
United States District Judge