**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

SHEILA GRIFFIN *as Independent*
*Administrator of the Estate of R.R., a*
*minor, now deceased*,
      Plaintiff,

v.

POYNTER et. al,
      Defendants.

Case No. 1:20-cv-01427-JEH-RLH

**Order**

Now before the Court is the Motion of Defendants Ashley Deckert, Mark Delashmit, Stefanie Moreau, Daniel Norris, Johanna O'Brien, Mark Ohrwall, Mary Ann Poynter, and Patricia Shannon (collectively "DCFS Defendants") for Summary Judgment. (189).[1] For the reasons set forth *infra*, the Motion for Summary Judgment (D. 189) is granted as to Count One and it is dismissed with prejudice; the Court declines to exercise its supplemental jurisdiction over the remaining state law claims which are dismissed without prejudice.

**I**

On April 5, 2022, the Court granted the Plaintiff leave to file a Second Amended Complaint.[2] *See* 04/05/2022 Text Order. On April 19, 2022, the Defendants filed a Motion to Dismiss, Memorandum in Support, and Answer.

---

[1] Citations to the electronic docket are abbreviated as "D. ___ at ECF p. ___."

[2] Pursuant to Fed. R. Civ. P. 5.2(a) and CDIL L.R. 5.11, the Court refers to the deceased minor by her initials, R.R. For the sake of clarity, the Court will refer to both Griffin, as Independent Administrator of the Estate of R.R., and R.R., as Plaintiff throughout this Order.

(D. 81, 82 & 83). On November 9, 2022, the Court denied the Motion to Dismiss. (D. 86). On June 26, 2025, the Defendants filed a Motion for Summary Judgment (D. 189) to which the Plaintiff filed a Response on August 14, 2025. (D. 192). On September 29, 2025, the Defendants filed a Reply. (D. 198). On October 16, 2025, the Defendants filed a Motion to Cite Authority (D. 199) to which the Plaintiff filed a Response on October 30, 2025. (D. 200). The matter is now fully briefed.

## II

The facts of this case are heartbreaking; a young girl, R.R., was fatally abused by her father's girlfriend, Cynthia Clay ("Clay"). She was later convicted of R.R.'s murder and R.R.'s father, Richard Rountree ("Richard"), pleaded guilty to endangering her life. This case also involves a series of disturbing acts and oversights by DCFS personnel as they investigated various allegations of abuse relating to R.R. If DCFS personnel had done things differently, R.R. may still be alive today, but we will never know. The issue before this Court, however, is not whether DCFS could have saved R.R. Instead, the question is whether the DCFS Defendants' conduct, or lack thereof, amounts to a constitutional violation under the Due Process Clause of the Fourteenth Amendment. As further explained below, because R.R.'s abusers are the parties that created the danger in this case and not the DCFS Defendants, the Court holds that the conduct alleged did not violate the Due Process Clause of the Fourteenth Amendment.

Anntionetta Rountree ("Anntionetta") is R.R.'s biological mother and Defendant Richard Rountree is R.R.'s biological father. (D. 189 at ECF p. 2). The two divorced during 2016 and Richard Rountree began living with his girlfriend, Cynthia Clay, in November of 2016. *Id.* In late September of that year, Anntionetta Rountree "was arrested and detained in jail for selling crack cocaine to two undercover police officers." *Id.* Thereafter, police contacted the Department of Child and Family Services ("DCFS") for assistance in placing R.R. and her sibling,

2

C.B., who were at the police station *Id.* Defendant Ashley Deckert ("Deckert") received the call and assigned Defendant Mary Ann Poynter ("Poynter") as the "on-call Child Protective Investigator" ("CPI"). *Id.* "In Illinois, all child welfare workers", such as the Defendants in this case, are "required to obtain a Child Welfare Employment License." (D. 198 at ECF p. 3). "Each of the named Defendants at issue" held such a license "during each of their respective involvement[s] in R.R.'s abuse and neglect investigations." *Id.*

As part of her initial investigative response, CPI Poynter reported credible evidence to indicate "allegations of risk of physical injury and injurious environment against Anntionetta" and met with Richard Rountree, whose parental rights were intact, and sent R.R. home with him—an arrangement Anntionetta also requested.[3] *Id.* at ECF p. 2-3. Richard Rountree was granted custody by the McLean County Circuit Court on November 21, 2016. *Id.* at ECF p. 3. Subsequently, CPI Poynter conducted a child protection assessment and recommended that the allegations be indicated against Anntionetta on November 22, 2016. *Id.* Defendant Mark Ohrwall reviewed CPI Poynter's investigation and agreed with her recommendation. *Id.*

## A

"On July 23, 2017, DCFS received a hotline call from a Bloomington [P]olice officer, reporting that R.R. advised Anntionetta Rountree that Cynthia Clay and Richard Rountree hit and whipped R.R." *Id.* Defendant Johanna O'Brien took the call, but did not participate in the investigation relating to R.R. *Id.* at ECF p. 4. An investigation was opened, and Defendant Mark Delashmit ("Delashmit") was

---

[3] "Pursuant to DCFS's administrative rules, an 'Indicated report' means 'any report of child abuse or neglect made to the Department for which it is determined, after an investigation, that credible evidence of the alleged abuse or neglect exists.'" (D. 189 at ECF p. 2-3 n.2).

3

assigned as the CPI. *Id.* Plaintiff alleges "Delashmit reviewed a recorded conversation between Anntionetta Rountree and R.R." indicating R.R. was being abused by Cynthia and Richard, including being forced "to stand in the hallway of the family home holding paint cans above her head for extended periods of time as punishment." (D. 192 at ECF p. 7). CPI Delashmit interviewed Richard Rountree the next day and screened him for substance abuse and domestic violence. (D. 189 at ECF p. 4). He also interviewed R.R.'s babysitter "who said she had never seen marks or bruises on R.R., that R.R. seemed to do well with her father, and that R.R. 'lied a lot.'" *Id.* CPI Delashmit then interviewed Anntionetta who informed him that Richard Rountree and Cynthia Clay "had been hitting R.R." *Id.* He also "interviewed R.R., who reported that Richard Rountree and Cynthia Clay 'whooped' her, causing bruises on her arms and neck" but "CPI Delashmit noted no bruises or marks on R.R." *Id.* Plaintiff disputes the Defendants' characterization of Delashmit's findings; "Delashmit's investigation was expunged and not produced in this case", and, for that reason, it is not possible to say whether he noted marks. (D. 192 at ECF p. 2-3). Lastly, CPI Delashmit interviewed Cynthia Clay and Richard Rountree at Richard's home, and Clay denied hitting R.R., stating Richard had disciplined her. (D. 189 at ECF p. 4). CPI Delashmit conferred with his supervisor, Defendant Ohrwall, who agreed with his recommendation that the allegations be marked as unfounded; the investigation was closed on July 24, 2017.[4] *Id.* Plaintiff alleges that it was marked as unfounded and that Delashmit recommended the investigation be closed "despite having contrary information because he did not believe R.R.'s admission that she was a child abuse victim, and because R.R.'s mother was motivated to make the complaint because of child

---

[4] "An 'Unfounded report' means 'any report of child abuse or neglect for which it is determined, after an investigation, that no credible evidence of the alleged abuse or neglect exists.'" (D. 189 at ECF p. 3 n.2).

4

support payments." (D. 192 at ECF p. 6). Plaintiff further claims that Delashmit did so despite knowing that closing the investigation may cause victims to be "reluctant to come forward in the future" and could "have the effect of emboldening the abuser such that abuse may continue or worsen." *Id.* at ECF p. 6-7.

**B**

On April 20, 2018, Anntionetta "called the DCFS hotline to report concerns of abuse involving R.R.", and R.R.'s "school principal called the hotline with more information a few hours later." (D. 189 at ECF p. 4-5). Defendant Stephanie Moreau ("Moreau") "was assigned to investigate, and she traveled to the school to meet with the principal and the school district's director of safety and security later that afternoon." *Id.* at ECF p. 5. "R.R.'s principal advised CPI Moreau that R.R. had a scab over her left eyebrow and that R.R. stated that she fell and hit her head on a medicine cabinet." *Id.* CPI Moreau interviewed R.R. and R.R.'s principal. *Id.* R.R. "again reported that she had fallen and hit her head in the bathroom." *Id.* "CPI Moreau also observed that R.R. had a dry skin around her left cheek along her jaw, a canker sore on her lip, and a chipped tooth; R.R. reported that she had fallen on her brother's dresser, and denied that anyone was hitting or hurting her." *Id.* Plaintiff states that CPI Moreau did an "initial supervisory consult" with her supervisor, Ohrwall, and put together a plan that would require a medical examination and that "other children in the home . . . be interviewed" because it was a "paramour household" pursuant to DCFS rules.[5] (D. 192 at ECF p. 8).

---

[5] Plaintiff alleges "Moreau's supervisor, had a responsibility pursuant to DCFS 300.70 to provide guidance and direction for all investigations of alleged child abuse and neglect by planning, supervising, reviewing, and coordinating the activities of the Child Protection Specialists under their supervision"; "the responsibility to ensure all investigations are conducted within the existing framework of statutes and

5

Moreau did not fill out a paramour assessment form. *Id.* "Shortly after the initial interview, CPI Moreau interviewed R.R. again, in person, with Todd Miller, R.R.'s guardian ad litem" ("GAL"). (D. 189 at ECF p. 5). CPI Moreau also met separately with GAL Miller to discuss Anntionetta's contact with R.R. being "limited to telephone calls on two days per week," among other things. *Id.* CPI Moreau additionally interviewed R.R.'s teacher, "who reported that he had never noticed any marks on R.R.'s face, that he communicated regularly with Richard Rountree and Cynthia Clay, and that R.R. seemed to be 'clumsy.'" *Id.* "Based on the information provided by R.R., her principal, and her teacher, CPI Moreau completed a Child Endangerment Risk Assessment Protocol ("CERAP"), identifying the 'safety decision' as 'safe'—that is, considering the safety factors, 'There are no children likely to be in immediate danger of moderate to severe harm at this time.'" *Id.* CPI Moreau reviewed her findings with her supervisor, Defendant Ohrwall, and determined R.R. could return home with Richard and Clay. *Id.* at ECF p. 5-6.

On April 23, 2018, CPI Moreau interviewed Richard on the phone and three days later, on April 26, interviewed Richard and Cynthia in person at their home and spoke briefly with R.R.; Moreau "observed no other signs of neglect or abuse in the home." *Id.* at ECF p. 6. The parties disagree as to whether those interviews revealed conflicting timelines as to when R.R.'s tooth was injured. (D. 198 at ECF p. 8-9). "CPI Moreau completed domestic violence and substance abuse screens of both Richard Rountree and Cynthia Clay; both were negative." (D. 189 at ECF p. 6). However, Plaintiff alleges CPI Moreau also conducted a criminal background

---

policies of the department and that all investigative contacts, activities and documentation are completed within the allotted time frames" and that he was "to provide Moreau 'regular and ongoing supervision.'" (D. 198 at ECF p. 8). However, for reasons discussed further below, it does not change the Court's analysis.

check and DCFS screening and "knew Cynthia had a prior indicated DCFS finding in 2012." (D. 192 at ECF p. 9). Despite this, and Cynthia's status as a paramour, Plaintiff alleges CPI Moreau "declined to make weekly visits to R.R.", that Moreau and Ohrwall "chose to forgo having R.R. sent to a doctor for examination", and "waived the DCFS required contact with R.R.'s treating physician" in violation of DCFS procedure. *Id.* at ECF p. 9-10. "CPI Moreau attempted, unsuccessfully, to interview Anntionetta Rountree during the investigation." (D. 189 at ECF p. 6). CPI Moreau also "communicated with R.R.'s doctor's office, which advised that R.R.'s doctor had not seen her since 2016 but had noted no previous concerns." *Id.* In response, Plaintiff states the office also informed CPI Moreau that it could not speak to abuse or neglect because of "the length of time since R.R.'s last visit." (D. 198 at ECF p. 10). On June 19, 2018, CPI Moreau recommended, and Defendant Ohrwall agreed, "that the investigation be closed and the allegations unfounded." (D. 189 at ECF p. 7). Moreau and Ohrwall determined R.R.'s facial injuries were minor and attributed them to R.R.'s "clumsiness." (D. 198 at ECF p. 10). Moreover, Plaintiff alleges the investigation was closed even though there were inconsistent timelines regarding R.R.'s tooth injury; that Richard Rountree declined the completion of a CERAP, and that there "was no final risk assessment of the current safety threat to R.R" or any interview of non-involved siblings in the home, in violation of DCFS policies. *Id.* at ECF p. 11.

## C

"On December 10, 2018, a nurse at R.R.'s elementary school called the hotline, reporting that R.R. had come to school with two black eyes in various stages of healing." (D. 189 at ECF p. 7). "DCFS assigned Defendant Patricia Shannon ("Shannon") to investigate and Defendant Daniel Norris ("Norris") as the DCFS Child Protection Supervisor, to supervise." *Id.* "On December 11, 2018, CPI Shannon contacted the school nurse, who described that R.R. had a healing

left black eye and a black right eye and that R.R. reported she had fallen on her toys." *Id.* "The school nurse noted that R.R. had missed school the previous Thursday and Friday" and "that she noticed no bruises on R.R. the previous Wednesday" nor did R.R.'s teacher "notice the black eye after R.R. returned to school." *Id.* "Shortly after speaking with the school nurse by phone, CPI Shannon went to the school, interviewed R.R.'s principal, and confirmed R.R.'s recent absences." *Id.* CPI Shannon interviewed R.R. with the principal present and R.R. "reported that she had fallen on her toy box when she tripped over a toy at home, hitting her face on the left side by her eye." *Id.* "According to CPI Shannon, R.R.'s description of the incident was consistent throughout the interview." *Id.* It is undisputed that R.R. did not offer an explanation for the injury to the right side of her face. (D. 198 at ECF p. 12). CPI Shannon did not interview R.R.'s teacher or her sibling, who is another student at the school. (D. 189 at ECF p. 7-8).

CPI Shannon contacted and instructed Richard Rountree and Cynthia Clay to take R.R. to the doctor the same day and visited their home that evening on December 11, 2018, but Clay did "not want CPI Shannon to speak with any of the children in the house." *Id.* at ECF p. 8. They did tell CPI Shannon that R.R. suffered an injury to the left side of her face and then, three days later, woke up with a bruise to the right side of her face. (D. 198 at ECF p. 13). "During a brief conversation, 16-year-old C.C., one of R.R.'s siblings, advised CPI Shannon that R.R. said she had fallen on a toy box, and that Cynthia Clay had given R.R. ice for her eye." (D. 189 at ECF p. 8). "CPI Shannon observed the closet being used as a toy room, noted boxes of toys and a plastic toy bin, and observed there was very limited space to move around." *Id.* "CPI Shannon also interviewed Cynthia Clay and Richard Rountree, who refused to complete substance abuse or domestic violence screens and reported being tired of DCFS calls." *Id.* After Richard and Cynthia took R.R. to visit Dr. Moy, CPI Shannon visited the home again and

"Cynthia Clay reported that she had taken R.R. to see a doctor, who reported that R.R. was fine and the bruising on her face all resulted from the single fall." *Id.* Plaintiff disputes this, alleging that "Cynthia reported that the doctor stated that the blood stream is being pulled [] across and this is how come you see the bruising on the other side of the face." (D. 192 at ECF p. 3). However, "[b]oth Richard Rountree and Cynthia Clay reported that R.R. was 'clumsy,' and that she had fallen when she tripped over her toys." (D. 189 at ECF p. 8). "CPI Shannon did not re-interview R.R., and reported that R.R.'s behavior and interactions with Cynthia Clay and Richard Rountree appeared ordinary." *Id.* Plaintiff states CPI Shannon was denied access to interview other children in the home by Cynthia and Richard, including C.B., R.R.'s sibling, roommate, and classmate, in contravention of DCFS policy. (D. 198 at ECF p. 13-14).

On December 12, 2018, CPI Shannon discussed the investigation with her supervisor Defendant Norris, who, "after reviewing the family's prior history and investigation, approved the CERAP as 'safe' and waived weekly visits." *Id.* at ECF p. 9. Plaintiff states Defendant Norris, CPI Shannon's supervisor, directed her not to interview C.B., R.R.'s sister, in violation of DCFS policy and that Norris waived requirements that the 2018 investigation be referred to law enforcement after CPI Shannon was denied access to other non-involved children in the home. (D. 198 at ECF p. 14).[6] "On December 13, 2018, CPI Shannon contacted R.R.'s physician to confirm that she had been seen on December 11, 2018."[7] (D. 189 at ECF p. 9). "The physician's office confirmed the visit and, at CPI Shannon's request, completed a

---

[6] Plaintiff alleges Norris failed to supervise CPI Shannon in a number of ways, but for reasons discussed below, those allegations are not determinative of the outcome in this case. (D. 198 at ECF p. 17).

[7] Plaintiff contends that "any contact" was "with a nurse by phone" or fax, and that Dr. Moy never made "any contact with anyone at DCFS regarding his December 11, 2018 evaluation of R.R." (D. 192 at ECF p. 3).

DCFS form that lacked information about prior incidents or injuries, but noted no additional risk factors or concerns." *Id.* However, Plaintiff disputes that fact; "Dr. Moy could not address whether any risk factors were present" because the December 11, 2018 evaluation was "his first time meeting the patient and that he did not have a past history." (D. 192 at ECF p. 3). Subsequently, on December 18, 2018, Defendant Norris reviewed CPI Shannon's investigation and "agreed with her recommendation to unfound the investigation", which was closed the next day, and alleges that Norris falsely stated "everyone has been seen" despite knowing various individuals had not been interviewed. (D. 198 at ECF p. 18). Plaintiff alleges CPI Shannon did not do the paramour assessment and falsely marked R.R. as safe in the CERAP. *Id.* at ECF p. 15. Defendant Norris also made a safe determination and Plaintiff alleges he falsely stated R.R.'s doctor attributed the injury to the right eye as "plausibly caused by blood traveling from one side to the other" and stated CPI Shannon had received discharge records from Richard and Cynthia regarding R.R.'s visit to Dr. Moy's office when they had not, and even though he allegedly knew DCFS had not independently verified Cynthia's account of the visit with Dr. Moy. *Id.* Additionally, Plaintiff alleges CPI Shannon discussed R.R.'s assessment with Dr. Moy, but Dr. Moy testified that he never spoke with Shannon or anyone from DCFS regarding R.R. and that he did not and would not advance a "blood pooling" theory as the cause of the injury to R.R.'s right eye. (D. 198 at ECF p. 16-17). Richard Rountree "does not know what the outcome of the December 2018" investigation was (D. 189 at ECF p. 9),[8] but testified that DCFS's involvement frustrated and angered Cynthia including texting him when she

---

[8] "DCFS sent letters to Richard Rountree and Cynthia Clay on January 21, 2019, which explained that the investigation was unfounded – but those letters were sent to a home in Bloomington in which they no longer lived." (D. 189 at ECF p. 9).

"would whoop R.R."[9] (D. 198 at ECF p. 20). He also testified he was aware she would spank R.R. with a belt and witnessed her knee R.R., which was also recorded on videos, along with other beatings. *Id.*

### D

"On January 25, 2019, the DCFS hotline received a call from a doctor at Children's Hospital of Illinois in Peoria after R.R. was transported to the hospital with life-threatening injuries." (D. 189 at ECF p. 9). The day after, R.R. died; "the cause of death was determined to be a peritonitis due to a perforated ileum, caused by blunt force injury of the abdomen." *Id.* at ECF p. 10. "An autopsy showed that R.R. had scars and abrasions on her body indicative of abuse." *Id.* Cynthia Clay was convicted of first-degree murder and Richard Rountree pleaded guilty to endangering the life of R.R. *Id.* Following her death, a DCFS investigation was opened and R.R.'s family and friends were interviewed and which further revealed and corroborated details regarding the abuse R.R. suffered. (D. 198 at ECF p. 23-24). Plaintiff's psychologist testified that "DCFS continued involvement in the home escalated Cynthia and Richard's abuse" because "each time DCFS involvement in the home ended without consequences" she felt "exonerated and entitled which increased R.R.'s risk of worsening abuse without protection". *Id.* Plaintiff's "board-certified child abuse pediatrician" testified that "the failures of the individual DCFS defendants led to escalating child abuse which ultimately caused R.R.'s death." *Id.* The Defendants dispute the testimony from the Plaintiff's psychologist and the pediatrician. *Id.*

---

[9] Because it does not change the analysis in this case, the Court declines to recount the specifics identified in text exchanges between Cynthia and Richard that detail the awful abuse R.R. suffered at their hands. (D. 198 at ECF p. 20-21).

### III

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323-24. Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrate that there is a genuine issue for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). "[A] party moving for summary judgment can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993). "The parties must support their assertions that a fact cannot be or is genuinely disputed by citing to 'particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . ..'" *Horton v. Pobjecky,* 883 F.3d 941, 948 (7th Cir. 2018). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . [I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* at 248. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson*, 477

U.S. at 255 (1986). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to successfully oppose a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 250.

## A

Count One of the Complaint alleges that the "Defendants Poynter, O'Brien, Moreau, and Shannon, while acting as DCFS Child Protection Specialists and under the color or law, and Defendants Deckert, Delashmit, Ohrwall, and Norris, while acting as DCFS Child Protection Supervisors and/or Public Service Administrators, and under the color of law, individually, jointly, and in conspiracy with each other, emboldened and encouraged R.R.'s abusers to punish, torture, and abuse her to the point of death, and ultimately deprived R.R. of her constitutional right to life, liberty, property, and equal protection under the law"[10] in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. (D. 75 at ECF p. 14-15). The Defendants argue that Plaintiff's "section 1983 due process claim against the DCFS Defendants fails as a matter of law" because "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." (D. 189 at ECF p. 13) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)).[11]

"To prevail on a § 1983 claim, the plaintiff must prove that '(1) [she] was deprived of a right secured by the Constitution or laws of the United States; and

---

[10] "Plaintiff does not respond to the DCFS Defendants' argument regarding any equal protection claim." (D. 198 at ECF p. 38). That claim is forfeited. *See Betco Corp., Ltd. V. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017). Moreover, "disparate impact does not violate the equal protection clause of the fourteenth amendment and cannot be redressed by suits under § 1983." *Bond v. Atkinson*, 728 F.3d 690, 692 (7th Cir. 2013) (internal citations omitted).

[11] "The claim is one invoking the substantive rather than the procedural component of the Due Process Clause; [plaintiff does] not claim that the State denied [R.R.] protection without according [her] appropriate procedural safeguards." *DeShaney*, 489 U.S. at 195.

(2) the deprivation was visited upon [her] by a person or persons acting under color of state law.'" *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (quoting *Buchanan-Moore v. Cnty. Of Milwaukee*, 570 F.3d 826, 831 (7th Cir. 2009)). In this case, the parties do not dispute whether the Defendants acted under color of state law; rather, the Defendants claim their actions did not violate any constitutionally protected right under the Due Process Clause of the Fourteenth Amendment. (D. 189 at ECF p. 13). For the reasons that follow, the Court grants the DCFS Defendants' Motion for Summary Judgment as to Count One.[12]

The Defendants principally rely on the Supreme Court's decision in *DeShaney* to support their contention that the acts alleged against them did not violate the Due Process Clause of the Fourteenth Amendment. (D. 189 at ECF p. 1). In *DeShaney*, the petitioner was a boy that "was beaten and permanently injured by his father, with whom he lived" and then sued "social workers and other local officials who received complaints that petitioner was being abused by his father and had reason to believe that this was the case," but "did not act to remove [the boy] from his father's custody." 489 U.S. at 191. The issue first surfaced when the second wife of the boy's father complained to the police that the boy was being abused, leaving marks, and stated that he was a "prime case for child abuse." *Id.* at 192. Social services interviewed the father who denied the accusations but did not pursue them further. *Id.* A year later, the boy was admitted to the hospital; the examining physician suspected child abuse and notified social services. *Id.* Social services immediately obtained an order from a juvenile court placing the boy in

---

[12] "The Plaintiff withdraws allegations of constitutional violations arising out of the 2016 investigation and placement of R.R. with her father, Richard Rountree, as set forth in Plaintiff's Second Amended Complaint, and Plaintiff agrees to dismiss Defendants, Mary Ann Poynter, Ashley Deckert, and Johanna O'Brien." (D. 192 at ECF p. 4). However, because the Court ultimately grants the Motion for Summary Judgment as to all the remaining DCFS Defendants, the Plaintiff's withdrawal does not affect the Court's analysis.

the temporary custody of the hospital. *Id.* Three days later, a "Child Protection Team" was assembled to investigate the situation and they concluded "there was insufficient evidence of child abuse to retain" the boy "in the custody of the court." *Id.* "Based on the recommendation of the Child Protection Team, the juvenile court dismissed the child protection case" and the boy was returned to his father's custody. *Id.* A month later, the boy returned to the emergency room for treatment of suspicious injuries and emergency personnel called social services, but the caseworker handling the case concluded there was no basis for further action. *Id.* For the next six months, the caseworker continued monthly visits and observed a number of suspicious injuries that she noted in her files, along with her suspicions that someone in the home was abusing the boy but did nothing more. *Id.* In November 1983, the boy was treated again for injuries in the emergency room that were believed to be caused by child abuse; social services was alerted, but when the caseworker visited the DeShaney home on two separate occasions following the incident, "she was told that [he] was too ill to see her." *Id.* at 193. Social services took no further action. *Id.* "In March 1984, Randy DeShaney beat [the] 4-year-old" boy "so severely that he fell into a life-threatening coma." *Id.* The boy and his mother brought an action against various government officials, including social services, alleging he was deprived of "his liberty without due process of law, in violation of his rights under the Fourteenth Amendment, by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." *Id.*

The Supreme Court concluded that the local officials had not "deprived him of his liberty in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Id.* at 191. "The Due Process Clause of the Fourteenth Amendment provides that '[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." *Id.* at 194. However,

15

"nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195. "The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.* "It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* In other words, the Due Process Clause is meant to "protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196.

The Defendants argue that *DeShaney* forecloses the Plaintiff's claims. (D. 189 at ECF p. 13-15). Indeed, the former judge presiding over this case noted that the facts of this case are "remarkably—and regrettably—similar to the factual background in *DeShaney*." (D. 30 at ECF p. 11). This Court concurs. In *DeShaney*, the authorities were alerted to suspicious injuries involving the victim on multiple occasions, and the juvenile court even placed the victim in the temporary custody of the hospital, but social services did not remove him from his father's custody. *See* 489 U.S. at 191-94. That was so even though an examining physician notified social services of suspected child abuse; emergency room personnel reported the victim's treatment for suspicious injuries on two separate occasions; the caseworker had observed and recorded a number of suspicious injuries on the victim's head during home visits; and, on two home visits, the caseworker was told the victim was too ill to see her. *Id.* at 192-03. Despite the warning signs, social services did nothing. *Id.* Here, similarly, DCFS personnel received a hotline call from a Bloomington Police officer, R.R.'s mother, and R.R.'s school nurse, among others, all reporting various suspicious injuries and concerns of abuse. (D. 189 at ECF p. 3-9). Still, DCFS did not remove R.R. from the home of Richard and

16

Cynthia. *Id.* Nonetheless, as the Court in *DeShaney* concluded "the State had no constitutional duty to protect [the boy] against his father's violence, its failure to do so—though calamitous in hindsight—simply does not constitute a violation of the Due Process Clause." 489 U.S. at 202. The same conclusion applies here: DCFS Defendants had no constitutional duty to protect R.R. even though their actions—or lack thereof—may be egregious and reprehensible in retrospect. *See id.* Despite the factual similarities and the Supreme Court's holding in *DeShaney*, the Plaintiff argues that the state-created danger exception applies to the facts of this case and that the facts here are "markedly different" because "the evidence here [is] that Defendants took affirmative actions that *increased* the risk of danger to R.R." (D. 192 at ECF p. 20) (emphasis in original).

**B**

In *DeShaney*, the "[Supreme] Court recognized two limited exceptions to th[e] general rule" that the state owes no constitutional duty to protect against acts of private violence.[13] *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 988 (7th Cir. 2021). Most relevant to the facts and arguments of this case is *DeShaney's* second exception, which "arises only by implication from a brief observation in the Court's opinion" insofar as the Court explained that "although the county and its social workers 'may have been aware' of the dangers the child faced in his father's home, they 'played no part in the[] creation of those dangers.'" *Id.* (quoting *DeShaney*, 489 U.S. at 199-200). That exception, referred to as "state-created dangers", is narrow; it applies "when the state 'affirmatively places a particular individual in a position of danger the individual would not otherwise

---

[13] The other exception applies when the state has "an affirmative duty to provide for the safety of a person it has taken into its custody involuntarily." *Id.* Because R.R. was never in custody, that exception is not relevant here.

have faced.'" *Id.* (quoting *Doe v. Vill. of Arl. Heights*, 782 F.3d 911, 916 (7th Cir. 2015)). First, "plaintiff must show that the state affirmatively placed him in a position of danger" and, second, "that the state's failure to protect him from that danger was the proximate cause of his injury." *Id.* "To satisfy the proximate-cause requirement, the state-created danger must entail a foreseeable type of risk to a foreseeable class of persons." *Id.* "A generalized risk of indefinite duration and degree is insufficient" to establish proximate cause. And, thirdly, "because the right to protection against a state-created danger arises from the substantive component of the Due Process Clause, the state's failure to protect the plaintiff must shock the conscience." *Id.* "Only the most egregious official conduct will satisfy this stringent inquiry." *Id*.

The Defendant's argue that the state-created danger exception does not apply because "R.R. faced danger from the abuse her stepmother and her father inflicted upon her, but—as in *DeShaney*—she faced that danger both before DCFS's involvement and afterwards." (D. 189 at ECF p. 16). In response, the Plaintiff argues that the Defendant's acted affirmatively through "deliberate, affirmative acts that increased the child's exposure to a specific, known danger." (D. 192 at ECF p. 21). Those acts are as follows.

As to the July 2017 investigation, Plaintiff points to the fact that Defendant Delashmit "**recommended** closing the July 2017 investigation despite having contrary knowledge of a disclosure of abuse by R.R., and an audio recording describing the same disclosure of abuse." *Id.* (emphasis in original). But that line of argument was also considered and rejected by the Supreme Court in *DeShaney*, "While the State may have been aware of the dangers . . . it played no part in their creation, nor did it do anything to render him any more vulnerable to them." 489 U.S. at 198-201. The Supreme Court reached that conclusion even though the state "took temporary custody of Joshua" and later "returned him to his father's

18

custody," it reasoned the state "placed him in no worse position than that in which he would have been had it not acted at all". *Id.* at 201. In this case, the state never took custody of R.R. and Delashmit's recommendation placed R.R. in no worse position than if Delashmit had done nothing at all. And, although Delashmit's conduct may be perturbing, the Court cannot contravene binding Supreme Court precedent that forbids transforming a state's failure to act into a constitutional violation of the Due Process Clause of the Fourteenth Amendment even though it may have had knowledge or suspicions of abuse. *See id.*

As to the April 2018 investigation, Plaintiff states "Defendant Moreau **made the determination** that R.R. was 'safe' under the CERAP despite not taking critical and mandatory steps to explore the 'indicated' background of [Cynthia] Clay, whose status as a paramour combined with her history of child abuse, put R.R. at greater risk for abuse." (D. 192 at ECF p. 24) (emphasis in original). Similarly, Plaintiff states "Defendant Moreau **recommended** and Ohrwall **determined** to close the investigation despite having knowledge that critical information was missing due to affirmative waivers, had contrary knowledge that there were inconsistent timelines and details to the descriptions of the injury, parents were refusing access to the child and a closing assessment, and other children in the home were not interviewed as required." *Id.* (emphasis in original). However, those mistaken determinations and failures to act—despite conspicuous reasons to do so—again advance an argument that hinges on a theory of liability that breaks with the Supreme Court's precedent under *DeShaney* and its progeny in the Seventh Circuit. "When courts speak of the state's 'increasing' the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Doe v. Vill. of Arl. Heights*, 782 F.3d 911, 917 (7th Cir. 2015). Defendant Moreau's erroneous determination that R.R. was safe, and his

19

concomitant failure to take the appropriate steps to confirm her safety, effectively amount to "standing by" and doing "nothing" to protect R.R. from her abusers—arguments the Seventh Circuit squarely rejected in *Doe*, 782 F.3d at 917. Next, Plaintiff argues that "Defendant Ohrwall **waived** DCFS required medical examination, which would have afforded the opportunity for a medical physician to look at the chipped tooth and whether the conflicting stories were plausible." *Id.* (emphasis in original). Again, while alarming, Defendant Ohrwall's waiver of the examination falls short of the kinds of acts that constitute a state-created danger to R.R.; there is no allegation that the chipped tooth was the result of any state action. "It is well to remember once again that the harm was inflicted not by the State of [Illinois], but by [R.R.'s] father" and his live-in girlfriend. *DeShaney*, 489 U.S. at 203.

As to the December 2018 investigation, Plaintiff alleges that "Defendant Norris **directed** Defendant Shannon to **not** interview other children in the home, in violation of DCFS policies"; "**waived** requirements to enlist law enforcement when parents deny access to children, the very children who had witnessed ongoing abuse to R.R" and "**improperly supervised** Shannon by failing to discuss details of the physician's involvement, where he could have learned that the blood pooling theory had not been provided by an actual medical professional." (D. 192 at ECF p. 24). For the reasons previously discussed, however, Plaintiff's allegations regarding Norris's directive that Defendant Shannon not interview other children in the home and his waiver of other requirements does not amount to a violation of the Due Process Clause. *DeShaney*, 489 U.S. at 196. In general, the Due Process Clause confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life [or] liberty". *Id.* That is also true with respect to Plaintiff's allegations that Defendant Shannon "**determined** that R.R. was 'safe' under the Child Endangerment Risk Assessment Protocol, despite having

knowledge that [Cynthia] had prior indicated history with DCFS and DCFS rules require the child be then marked 'unsafe'"; "falsely documented that Dr. Moy opined that the reason R.R. had two black eyes . . . was because blood travelled from one injured eye up across the bridge of the nose and pooled under the other eye" and "**misled** her supervisor by falsely stating or not correcting the record that this blood pooling theory came from the physician directly, instead of being recounted by the alleged abuser."[14] *Id.* (emphasis in original). Though Plaintiff "characterizes [DCFS's] ineffectual response as affirmatively increasing the danger to [R.R.]", the Seventh Circuit has held similar attempts cannot "skirt precedent." *Wilson-Trattner v. Campbell*, 863 F.3d 589, 594 (7th Cir. 2017); *see Doe*, 782 F.3d at 918 ("Not even the allegations that Del Boccio called off Officer Spoerry (or falsely reported to dispatch that the subjects were gone) created or increased the danger to Doe."). The Court is mindful of the fact that "[t]o 'create or increase' [danger] must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect and thus circumvent *DeShaney's* general rule." *Doe*, 782 F.3d at 916 (citations omitted). Even if the Court were to assume, as the Plaintiff portends (D. 192 at EF p. 29), that DCFS's "failure to intervene ultimately increased the danger to [Plaintiff] by indirectly emboldening [the abuser] to continue to mistreat her, that would not distinguish her case from *DeShaney*" under Seventh Circuit precedent. *Wilson-Trattner*, 863 F.3d at 594. That is because if the state-created danger exception functioned as a "constitutional rule prohibiting any act, by any public official, that increases private danger", then

---

[14] For the same reasons, Plaintiff's allegations that Defendant Shannon recommended and that Defendant Norris determined to close the case in reliance on information that was either withheld or false does not change the analysis. (D. 192 at ECF p. 24-25).

"*DeShaney* itself is wrongly decided." *Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019).

The Plaintiff argues that *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998), "demonstrates similar liability under Section 1983." (D. 192 at ECF p. 24).[15] In *Monfils*, the Plaintiff called the police department with an anonymous tip alleging another worker, Kutska, was going to steal an electrical cord from the plant. *Monfils*, 165 F.3d at 513. Kutska then went about trying to discover who the informant was from the police department, while the Plaintiff made several calls to the police department pleading with its officers not to release the tape to Kutska because he was "known to be violent." *Id.* at 513-14. There, the Court found Deputy Chief of Detectives Taylor ("Taylor") created a danger that Plaintiff would not have otherwise faced. *Id.* In so concluding, the Court reasoned that "liability exists when the state 'affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.'" *Id.* (quoting *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993)). As to Taylor specifically, Plaintiff relayed his concerns directly to Taylor who assured him the tape would not be released. *Id.* at 514. "Despite Taylor's assurance that the tape would not be released," Plaintiff also called the Assistant District Attorney ("ADA") who assured Plaintiff that he would also call Taylor and instruct him not to release it. *Id.* at 515. The ADA did, and Taylor told the ADA he was familiar with the case. *Id.* The ADA also offered to call Lampkin, who worked in the communication section of the police department and to whom a "request for a copy of the tape would normally be directed," but Taylor assured the ADA "he would take care of

---

[15] Plaintiff cites to a number of other cases outside of the Seventh Circuit that are not binding on this Court. *See, e.g.*, (D. 192 at ECF p. 21-23) (discussing Tenth and Sixth Circuit cases). Therefore, the Court declines to engage with those Courts' analysis because this Court is obliged to follow Seventh Circuit and Supreme Court precedent.

it" and "assured [the ADA] that the tape would not be released." *Id.* Taylor did neither. *Id.* The next day, Kutska obtained a copy of the tape and Plaintiff "was dead by 7:30 a.m." *Id.*

Admittedly, on first impression, *Monfils* could be read to intimate that the state-created danger exception might apply to the facts of this case because there, like here, the officer did not take "standard steps to prevent the tape's release despite knowing that the release would place the informant in heightened danger, and the informant was killed." *Doe*, 782 F.3d at 917. Similarly, here, the DCFS Defendants failed to act. However, the Seventh Circuit has characterized *Monfils* as a case in which "the police encountered a potential danger and turned it into an actual one" and that "the plaintiff was safe, or at least considerably safer, before the police acted than he or she was thereafter."[16] *Doe*, 782 F.3d at 917. In other words, but for the state's release of the tape, Plaintiff in that case would have been considerably safer. *Id.* Importantly, and distinguishably from the instant case, the DCFS Defendants did not affirmatively release any information to R.R.'s abusers that put her at a heightened risk or affirmatively provide assurances regarding her safety. Put differently, R.R. was not considerably safer before DCFS entered the picture, and that is unlike the Plaintiff in *Monfils* who was considerably safer before the state released the tape. In this case, DCFS did not "encounter[] a potential danger and turn[] it into an actual one." *Doe*, 782 F.3d at 917. It is clear that R.R. was already in danger. Other cases in which the state-created danger has applied confirm that principle more clearly.

In one case, "[f]or example, the police arrested a driver for drag racing and left the children passengers stranded alone in the car on a busy highway on a cold

---

[16] Proximate cause issue

night." *Id.* (internal citations omitted). In another, the police "arrested a sober driver and left behind an obviously drunk passenger with the keys to the vehicle who later caused a collision." *Id.* (internal citations omitted). In these cases, "the police encountered a potential danger and turned it into an actual one." *Id.* By contrast, the court has held that a "police officer's failure to intervene to protect a student despite knowledge that she was being sexually molested by a middle school teacher did not increase the danger." *Id.* (internal citations omitted). That is because, in order to succeed under the narrow state-created danger exception, a "plaintiff must show that the state affirmatively placed him in a position of danger the individual would not otherwise have faced." *Id.* (citations omitted). In this case, the DCFS Defendants' acts—while harrowing—did not place R.R. in or create the danger she faced, her abusers did. The Plaintiff contends that they did increase the danger because "testimony from R.R.'s father [revealed] that Cynthia Clay— the abuser—was growing more frustrated and angrier due to DCFS Involvement" and that there are text messages showing "an increasingly angry Cynthia." (D. 192 at ECF p. 26). Indeed, Plaintiff's "psychologist opined that the DCFS Defendants' continued involvement and failed investigations escalated the abuse to R.R. because each time DCFS Defendants' involvement in the home ended without consequences, Cynthia felt exonerated and entitled". *Id.* at ECF p. 28. In essence, the "DCFS Defendants continued, failed investigations emboldened the abuser and caused her to increase the abuse." *Id.* at ECF p. 28. But a nearly identical argument fell short in *Wilson-Trattner*, 863 F.3d at 594. There, in a case of progressive abuse, the Seventh Circuit observed, "Wilson-Trattner also makes a more general argument that the appellees' dismissive and indifferent attitudes to each of the incidents above endangered her by progressively emboldening [the abuser]." *Id.* "That contention is, however, squarely foreclosed by *DeShaney*." *Id.*

The Court is naturally sympathetic to the Plaintiff's attempts to characterize the DCFS Defendants' conduct as affirmative acts, including the closure of cases prematurely despite having contrary knowledge of abuse disclosures, DCFS personnel "affirmatively" seeking and giving "waivers of mandatory procedures", and their alleged withholding or placing of false information in reports. *See* (D. 192 at ECF p. 29). Unfortunately, such characterizations do not change the fact that they culminate in the state's failure to act on R.R.'s behalf; under the Fourteenth Amendment, "a State's failure to protect an individual against private violence" does not "constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 189. Taking the facts in the light most favorable to the Plaintiff, and in faithfully applying the Supreme Court's precedent in *DeShaney*, the Plaintiff does not have a constitutional right under the Due Process Clause of the Fourteenth Amendment to have the case closed properly, mandatory state procedures applied, nor a right to have information—whether true or false—correctly included in DCFS files, or shared with physicians, supervisors, law enforcement, or otherwise. *See id.* Therefore, the Court grants summary judgment as to Count One with prejudice and because the Court concludes the state-created danger exception does not apply, the Court need not decide the proximate cause question or whether the Defendants' conduct shocks the conscience.[17]

## IV

To comport with the Supreme Court's directive that immunity questions be resolved "at the earliest possible stage in litigation," the Court also addresses the

---

[17] Plaintiff also asserts a failure to train theory of § 1983 liability insofar as "Defendants Norris and Ohrwall improperly supervised their subordinates, causing constitutional violations." (D. 192 at ECF p. 26). However, as the Defendants correctly note, that theory "cannot proceed without evidence of an underlying constitutional violation, which, for reasons set forth above," the Court finds do not violate the Due Process Clause of the Fourteenth Amendment. *See Wilson-Trattner*, 863 F.3d at 596.

Defendants' assertion of qualified immunity. *Sabo v. Erickson*, 128 F.4th 836, 842-43 (7th Cir. 2025) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "The doctrine of qualified immunity 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson*, 555 U.S. at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether an official is entitled to qualified immunity involves a two-step inquiry, "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013).[18] "If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018)). "To be 'clearly established,' a constitutional right 'must have a sufficiently clear foundation in then-existing precedent.'" *Campbell v Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *District of Columbia v. Wesby*, 534 U.S. 48, 63 (2018)). "The principle of fair notice pervades the doctrine." *Id.* "Qualified immunity applies unless the specific contours of the right 'were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Id.* (citations omitted). "Clearly established law cannot be framed at a 'high level of generality.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). And while a "'case directly on point' isn't required, 'precedent must have placed the . . . constitutional question beyond debate'". *Id.* (internal citations

---

[18] The Court has previously found that Count One as alleged does not constitute a constitutional violation under the Due Process Clause of the Fourteenth Amendment, but the Court nonetheless addresses the second prong of the qualified immunity analysis pursuant to the Supreme Court's directive.

omitted). To answer whether the question is "beyond debate," the "Supreme Court has repeatedly emphasized that the clearly established law must share specific details with the facts of the case at hand." *Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. 2022).

The Defendants argue that "[e]xisting precedent *has* placed the constitutional question beyond debate—but in Defendants' favor." (D. 189 at ECF p. 27) (emphasis in original). In response, the Plaintiff claims that "the Seventh Circuit has found that '[i]t is clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution.'" (D. 192 at ECF p. 32) (quoting *Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012)).[19] In *Paine*, the plaintiff was a mentally-ill woman who was arrested and later transported to another police station miles away and subsequently released in a high-crime area, without her phone, despite displaying clear mental health issues and was later raped at knifepoint, which led to her jumping from a window seven stories above ground in order to escape. *Id.* at 503-06. The Seventh Circuit limited the principle Plaintiff relies on from *Paine* to the facts of that case: "it *is* clearly established that the police may not create a danger, without justification, by arresting someone in a safe place and releasing her in a hazardous one while unable to protect herself, and it is also clearly established that police must arrange for medical treatment of serious conditions while custody continues." 678 F.3d at 511. In a subsequent case, the Seventh Circuit also plainly rejected arguments like Plaintiff's that characterize "*DeShaney* as equivalent to a constitutional rule prohibiting any act, by any public

---

[19] The other cases Plaintiff relies on as to this issue are from the Tenth and Sixth Circuit. (D. 192 at ECF p. 33). This Court is bound to follow precedent from the Seventh Court and the Supreme Court and the Plaintiff has not cited a case within either the Seventh Circuit or the Supreme Court that places the constitutional question according to "then-existing precedent" "beyond debate." *Campbell v Kallas*, 936 F.3d 536, 545 (7th Cir. 2019).

official, that increases private danger"; the Court observed, "if that were so . . . then *DeShaney* itself is wrongly decided." *Weiland*, 938 F.3d at 919. Furthermore, as the facts of *Paine* make clear, this case does not share similar allegations of wrongdoing against the police, nor was Plaintiff ever taken into custody. *Paine*, therefore, does not help the Plaintiff because it does not "share specific details with the facts of the case at hand." *Doxtator*, 39 F.4th at 863. Consequently, *Paine* does not amount to applicable, clearly established law. *See id.* To the contrary, the most analogous case to the instant one is *DeShaney*, which would suggest the opposite conclusion: that the Defendants were not violating a clearly established constitutional right. There, the underlying facts in *DeShaney* were summarized aptly by the Chief Justice:

> Petitioner is a boy who was beaten and permanently injured by his father, with whom he lived. Respondents are social workers and other local officials who received complaints that petitioner was being abused by his father and had reason to believe that this was the case, but nonetheless did not act to remove petitioner from his father's custody. Petitioner sued respondents claiming that their failure to act deprived him of his liberty in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. We hold that it did not.

489 U.S. at 191. Like here, the facts of that case were "undeniably tragic." *Id.* But, they also bear an undeniable similarity to the fact pattern here. As to the issue of qualified immunity, *DeShaney* and its progeny place the constitutional question as to the clearly established law "beyond debate", but in the Defendants' favor. *Doxtator*, 39 F.4th at 863. Accordingly, even if Plaintiff's § 1983 claim was not already subject to dismissal under *DeShaney*, it would also be barred by the doctrine of qualified immunity because the constitutional right was not clearly established at the time of the alleged violation. Because of that, the Defendants are

28

entitled to summary judgment as to Count One and it is dismissed with prejudice. *See Gibbs v. Lomas*, 755 F.3d 529, 637 (7th Cir. 2014).

## V

In this case, the Court is dismissing the sole federal cause of action—Count One—with prejudice. As a result, no claim over which the Court has original jurisdiction remains. And, as a "general rule, when the federal claims fall out before trial," the district court "should relinquish jurisdiction over any supplemental . . . state law claims in order to minimize federal intrusion into matters of purely state law." *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015) (quoting *Carr v. Cigna Secs., Inc.*, 95 F.3d 544, 546 (7th Cir. 1996)). Therefore, the Court declines to exercise its supplemental jurisdiction over the remaining state law claims and the remaining Counts are dismissed without prejudice. *See* 28 U.S.C. § 1367(c)(3).

## VI

For the reasons set forth *supra*, the Defendants' Motion for Summary Judgment (D. 189) is granted as to Count One and it is dismissed with prejudice; the Court declines to exercise its supplemental jurisdiction over the remaining state law claims which are dismissed without prejudice. Therefore, the Clerk is directed to enter judgment in favor of the DCFS Defendants and close the case.

*It is so ordered.*

Entered on November 13, 2025

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE

29